# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1914-24

G.C.,

    Plaintiff-Respondent,

v.

D.C.B.,

    Defendant-Appellant.

_____

        Argued May 19, 2026 – Decided July 13, 2026

        Before Judges Sumners and Susswein.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Gloucester County, Docket No. FV-08-0118-25.

        Vincent A. Campo argued the cause for appellant (Hoffman & DiMuzio, attorneys; Vincent A. Campo, on the brief).

        Respondent has not filed a brief.

PER CURIAM

Defendant appeals the family court's entry of a final restraining order (FRO) under the Prevention of Domestic Violence Act of 1991, N.J.S.A. 2C:25-17 to -35, arising from his high school dating relationship with plaintiff. We agree with defendant that there was insufficient evidence to support the family court's finding of "alarming conduct" constituting harassment under N.J.S.A. 2C:33-4(c) for sharing with a third party an explicit video (sex video) of the parties' consensual sex. However, we conclude there was sufficient evidence to support the family court's finding that defendant harassed plaintiff in accordance with N.J.S.A. 2C:33-4(a) for persistent communications to her causing "annoyance or alarm." Given that the family court determined an FRO was necessary due to both alarming conduct and persistent communications, we remand for the court to determine if plaintiff proved that she was entitled to an FRO solely due to defendant's persistent communications.

I.

On four separate dates over the course of approximately three months, the family court conducted an FRO hearing. We summarize the testimony that is relevant to this appeal.

Plaintiff and defendant, who is two years older than she is, began dating during her sophomore year in March 2021. About twenty months into their

dating relationship, the parties took consensual photos and three sex videos of their intimate encounter on defendant's phone.

In early 2023, according to plaintiff, they broke up due to arguing and defendant's infidelity. Plaintiff testified that, after their relationship ended and through December 2023, there were "back[-]and[-]forth" periods when she would tell defendant not to contact her anymore, but he would continue to do so through blocked numbers or social media, and periods when they were on speaking terms and even intimate. After initially claiming that she had "cut communication off completely" with defendant in December 2023, she clarified on cross-examination that she occasionally answered defendant's calls and even initiated at least four calls between then and February 2024, mainly to tell him to stop calling. Plaintiff testified that when defendant persisted in communicating with her after December 2023, she was "afraid of what would happen if he didn't stop calling," and "was still not . . . sure that he didn't have the [sex] videos," so she was afraid of what "he would do with [them]." She also testified that this same fear caused her to "[become] intimate with him" after their breakup.

The parties disputed the frequency of defendant's attempted communications with plaintiff. However, based on the call log evidence,

3

defendant called plaintiff at least twenty-two times between March and June 2024, with several of the calls being back-to-back and lasting only one minute.

Plaintiff testified that when she initially broke up with defendant, "he promised that he would delete [the sex videos and pictures] . . . [a]nd then threats would start where he would say that . . . he's gonna send [them] to one of his friends and say 'have fun with this.'" She presented evidence of several threatening texts defendant sent her shortly after their breakup, stating: (1) "I'm gonna make u upset unless u tell me who the guys ur talking to is . . . [right now], then I won't do [nothing] stupid"; "[n]ow I'm def[initely] getting a hold of him[,] [n]ow it's gonna be worse for u"; (3) "Ima keep calling till u answer or block me"; "I'll make ur life miserable." Plaintiff stated the texts were in reference to other people she was dating and that she understood defendant to be saying he would "get[] in contact with the people . . . [she] was forming a relationship with and . . . ruin[] it . . . [b]y giving them false narratives."

In July 2024, plaintiff testified that her brother told her some of the boys on the high school's football team were "making fun of him because they were saying that they'd seen the [sex] video." The boys were J.K. and J.C., who both testified for the defense.

A-1914-24

J.K. testified that he did not know defendant but knew of him because he was revered as a high school football "legend." J.K. recalled the July incident as follows:

> So it was in . . . the weight room . . . [a]nd [plaintiff's brother] [is] on one side, I'm on the other side. Like, different stations. I go down there to do one of my workouts. I'm messing around, as I always do. And I was like, "Yo, [plaintiff's brother], did you see the video of your sister?" . . . And I was messing with him. He said, "Yo, what video?" He started to get like irritated. So I was like messing with him a little more. I was like, "You know. The . . . video." He's like, "What video?" I was like, "No video." And I walked away. He followed me. I go up to [J.C.]. I'm like, "Yo, [J.C.], you know the video." And I looked at [J.C.] I was like, like gave him like the look. And he was like, "Oh yeah, I know the video." And then after that, that was pretty much the conversation.

J.K., sensing plaintiff's brother left the weight room because he was upset, went to apologize to him. He testified that on July 9, he texted plaintiff's brother: "Yo, I'm sorry for messing with you. Everything I said was a joke and I know you took it serious . . . I don't want you to quit over something so stupid." J.K. stated that when we went up to plaintiff's brother in the weight room he did not know that there was an actual sex video, or that it was related to defendant and plaintiff, and that it was a total coincidence that he made that joke. He testified

5

A-1914-24

that he had made a similar joke to another teammate prior to this incident, but that he had never heard "any murmurings about a video concerning [plaintiff]."

J.C. also stated he was not defendant's friend but knew of him from his older brother, who was friends with defendant. J.C. testified that he never actually saw a sex video involving plaintiff and did not even know what the video in question was about, but that he was just playing along with J.K.'s joke with plaintiff's brother.

Plaintiff testified that after her brother told her about the weight room incident, she reported to the local police that "[s]he had heard rumors that there was an inappropriate video [of her] possibly floating around." That same day, defendant initially told the investigating detective that he did not have the sex video but then admitted that he did. With defendant's consent to search his phone, the detective saw three separate sex videos involving plaintiff and defendant, and five photos of plaintiff. Plaintiff told the detective she was seventeen years old at the time the sex videos and photos were taken. Despite knowing that plaintiff's age warranted defendant being charged with child pornography on his phone, there was no investigation to determine whether defendant sent the sex videos or photos to another person.

A-1914-24

The detective testified that she did not check if the sex videos were backed up on other devices, nor did she interview J.K. or J.C. to determine if they had seen the sex video. At her direction, defendant deleted the sex videos and photos in her presence; she does not know if copies exist. The detective testified that her supervisors directed her not to press charges against defendant.

Plaintiff called defendant to testify because defense counsel indicated that he would not be calling defendant to testify on his own behalf. Defendant declined to answer any questions, invoking his Fifth Amendment right not to testify.

At the trial's conclusion, the family court reserved its decision. Six days later, the court issued an FRO against defendant and a bench decision. The court explained that, in accordance with the well-settled Silver[1] two-prong test, plaintiff proved by a preponderance of the evidence that defendant committed predicate acts of domestic violence — (1) harassment by making or attempting

---

[1] In Silver v. Silver, 387 N.J. Super. 112, 125–27 (App. Div. 2006), we set forth a two prong tests to enter an FRO. First, "the [court] must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125. Second, if a predicate act is proven, the court must determine whether a restraining order is necessary to protect the plaintiff from immediate harm or further acts of abuse. Id. at 126–27.

A-1914-24

to make persistent communication to cause plaintiff alarm or annoyance under N.J.S.A. 2C:33-4(a); and (2) harassment through the alarming conduct of sharing the parties' sex videos and plaintiff's explicit pictures under N.J.S.A. 2C:33-4(c) — and an FRO was needed to protect plaintiff.[2]

---

[2] The family court found that plaintiff did not prove cyber harassment. N.J.S.A. 2C:33-4.1 provides that:

> A person commits the crime of cyber-harassment if, while making one or more communications in an online capacity via any electronic device or through social networking site and with the purpose to harass another, the person:
>
> (1) threatens to inflict injury or physical harm to any person or the property of any person;
>
> (2) knowingly sends, posts, comments, requests, suggests, or proposes any lewd, indecent, or obscene material to or about a person with the intent to emotionally harm a reasonable person or place a reasonable person in fear of physical or emotional harm to his person; or
>
> (3) threatens to commit any crime against the person or the person's property.

The court ruled there was no evidence that "[d]efendant threatened to injure [or] physically harm . . . [p]laintiff, or that he knowingly sent posts, comments, requested, suggested, or proposed any lewd, indecent or obscene material to or about the victim in . . . an online capacity or through a social media site."

A-1914-24

II.

Defendant argues:

POINT I

THE TRIAL COURT MADE AN ERROR OF FACT
WHEN IT FOUND THAT [DEFENDANT] SHOWED
OR OTHERWISE SHARED THE VIDEO [WITH] J.K.

POINT II

THE TRIAL COURT ERRED AS A MATTER OF
LAW WHEN IT DID NOT ASSESS THE
MANDATORY STATUTORY FACTORS UNDER
N.J.S.A. 2C:25-29(a).

We address these arguments in turn.

A.

Defendant argues that the family court erred in finding that he harassed plaintiff per N.J.S.A. 2C:33-4(c), by his alarming conduct of "show[ing] or otherwise shar[ing] the [sex] video" with J.K. to alarm or annoy her. We ordinarily defer to the family court's expertise because it routinely hears domestic violence cases, J.D. v. M.D.F., 207 N.J. 458, 482 (2011), and we do not disturb its factual findings and legal conclusions unless we are "convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice," Cesare v. Cesare, 154 N.J. 394, 412 (1998) (quoting Rova Farms Resort, Inc. v.

9

Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). Based on the record before us, we are persuaded there is merit to defendant's claim that the court lacked sufficient evidence to find that J.K. saw the sex video because of defendant's conduct.

The family court's findings were predominantly based on J.K.'s "inherently unbelievable" testimony that "out of all the boys in the weight room" he picked plaintiff's brother, and "randomly conjured up a joke about the existence of" a sex video involving his sister. While the court assessment is plausible, there is no evidence that defendant shared a sex video with J.K. or anyone else. There may have been a rumor about the sex videos, but there is no credible evidence that defendant showed any of the videos to anyone else to "alarm or seriously annoy" plaintiff. See N.J.S.A. 2C:33-4(c). Indeed, no witnesses testified that they saw a sex video. Beyond the parties' conversations, the only mention in the record about the sex videos was the weight room conversation between J.K., J.C., and plaintiff's brother. Indeed, plaintiff did not testify that anyone other than defendant ever said anything to her about the sex videos. It would have been helpful to resolve plaintiff's allegation if the police had investigated whether defendant's phone revealed that the sex videos were sent to anyone or to another device. But as the detective testified, this did not occur.

The court found that J.K. saw the video because he referred to defendant by his nickname, knew defendant through his older brother, and admired defendant as a high school football player. However, it appears that the trial court confused J.K.'s testimony with J.C.'s testimony. It was J.C. who testified that his older brother was friends with defendant and played football with him, and defendant was a highly regarded football player. And it was J.K. who testified that he did not know defendant but only knew of him because his older brother played football against defendant in high school. However, regardless of J.K.'s prior dealings or connection with defendant, there is no evidence that defendant sent or showed J.K. the video.

While it seems improbable that J.K. coincidentally joked about a sex video depicting plaintiff to her brother, this does not support the finding that defendant showed J.K. the video, considering the lack of evidence of a relationship between J.K. and defendant, and the lack of any evidence that defendant shared the video with J.K. It is true that defendant threatened to do something "stupid" and to make plaintiff's life "miserable," but these threats did not explicitly refer to the sex videos. Plaintiff's belief that defendant meant he would disseminate the videos to others had no factual support. Accordingly, the family court mistakenly found that "the sharing of the [sex] video constitutes harassment

11

under" N.J.S.A. 2C:33-4(c). "A violation of N.J.S.A. 2C:33-4(c) . . . requires proof of a course of conduct." J.D., 207 N.J. at 478. There is insufficient evidence to determine that the sex video was shared and therefore that "alarming conduct . . . with the purpose to seriously annoy" plaintiff occurred. N.J.S.A. 2C:33-4(c).

B.

We next address defendant's argument that the family court did not analyze the required factors from N.J.S.A. 2C:25-29(a) to determine if an FRO was necessary to protect plaintiff. Defendant acknowledged that while an FRO may still be issued even if none of the statutory factors apply, this matter is not such a case because there is no physical violence or history of domestic violence.

In determining whether an FRO is necessary, the court must evaluate the factors set forth in N.J.S.A. 2C:25-29(a). Silver, 387 N.J. at 127. Those factors are:

> (1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
>
> (2) The existence of immediate danger to person or property;
>
> (3) The financial circumstances of the plaintiff and defendant;

(4) The best interests of the victim and any child;

(5) In determining custody and parenting time the protection of the victim's safety;

(6) The existence of a verifiable order of protection from another jurisdiction; and

(7) Any pattern of coercive control against a person that in purpose or effect unreasonably interferes with, threatens, or exploits a person's liberty, freedom, bodily integrity, or human rights . . . .

[N.J.S.A. 2C:25-29(a)(1)-(7).]

"[W]hether the victim fears the defendant" is an additional factor that the trial court may consider. G.M. v. C.V., 453 N.J. Super. 1, 13 (App. Div. 2018) (quoting Carfagno v. Carfagno, 288 N.J. Super. 424, 435 (Ch. Div. 1995)).

Defendant's contention that the family court failed to consider the N.J.S.A. 2C:25-29(a) factors is controverted by the record. The court did consider those factors without explicitly naming them. However, the court's analysis was based on its finding that the sharing of the sex video constituted harassment under N.J.S.A. 2C:33-4(c). The court addressed factor one dealing with "previous history of domestic violence," finding that there was none. N.J.S.A. 2C:25-29(a)(1). The court considered the factor two regarding the "immediate danger to person or property," finding that there was an ongoing risk of defendant sharing the video. N.J.S.A. 2C:25-29(a)(2). The court did not explicitly

13

consider factor three regarding the parties' financial circumstances; however, no such information was provided in the record. N.J.S.A. 2C:25-29(a)(3). The court considered factor four regarding the best interests of the victim, determining she was at risk of "embarrassment and humiliation" were the video to be further disseminated. N.J.S.A. 2C:25-29(a)(4). Factors five and six addressing custody issues and the "existence of a verifiable order of protection from another jurisdiction" do not apply here. N.J.S.A. 2C:25-29(a)(5), (6). And there was no evidence of coercive control that "unreasonably interfere[d] with . . . [plaintiff's] liberty, freedom, bodily integrity or human rights" for the court to consider. N.J.S.A. 2C:25-29(a)(7).

The family court's analysis of the second Silver prong was entirely dependent on its finding that defendant shared the sex video as it determined that, despite the lack of history of domestic violence in the parties' relationship, "the act of sharing the sexually explicit video footage of [plaintiff] with a third party . . . [was] an egregious act and thus sufficient to establish the need for protection and an [FRO]." But as explained above, we conclude there was insufficient evidence that defendant harassed plaintiff under N.J.S.A. 2C:33-4(c), by sharing the sex video to someone else to alarm or annoy her. As the

14

court solely relied on harassment under N.J.S.A. 2C:33-4(c), the issuance of an FRO on that basis fails.

Defendant, however, does not contest the court's finding of harassment for persistent communication to cause annoyance or alarm under N.J.S.A. 2C:33-4(a). Moreover, there is no basis to challenge that finding given the record clearly shows that defendant made numerous unwanted communications to plaintiff via text and social media to annoy her.

Nevertheless, because we conclude that defendant only harassed plaintiff under N.J.S.A. 2C:33-4(a) due to his persistent communications to alarm or annoy her, we remand for the court to consider whether an FRO should be issued by applying N.J.S.A. 2C:25-29(a)(1)-(7) based upon that predicate act. Remand must be completed within sixty days. We leave it to the family court's discretion whether to permit further briefing or have supplemental arguments considering this opinion.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-1914-24